IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 2, 2001

## STATE OF TENNESSEE v. CHARLES ORLANDO FIELDS

**Appeal from the Circuit Court for Obion County**
**No. 9-411      William B. Acree, Jr., Judge**

─────────────

**No. W2001-00124-CCA-R3-CD  - Filed January 2, 2002**

─────────────

The defendant, Charles Orlando Fields, was indicted for one count of selling one-half gram or more of cocaine within one thousand feet of a school, a Class A felony, and one count of distributing one-half gram or more of cocaine within one thousand feet of a school, a Class A felony.  An Obion County Circuit Court jury convicted him of both counts.  The trial court merged the distributing cocaine conviction into the selling cocaine conviction and sentenced the defendant as a Range II, multiple offender to thirty-three years in the Tennessee Department of Correction.  The defendant appeals, contending that the evidence is insufficient to support his conviction and that his sentence is excessive.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ROBERT W. WEDEMEYER, J., joined.

Clifford K. McGown, Jr., Waverly, Tennessee (on appeal); Joseph P. Atnip, District Public Defender and Kevin McAlpin, Assistant Public Defender (on appeal); and Tom Rogers, South Fulton, Tennessee (at trial), for the appellant, Charles Orlando Fields.

Paul G. Summers, Attorney General & Reporter; Laura McMullen Ford, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to an undercover drug operation conducted by the Obion County Drug Task Force.  Lieutenant Rick Kelly of the Union City Police Department testified as follows: He supervised an undercover drug operation in Obion County from September to October 1999.  Kim Hamlin worked in the undercover operation as a cooperating witness.  Because Ms. Hamlin was a known abuser of drugs and alcohol and had prior bad check convictions, the police recruited Amanda Bell, who had a law enforcement background, to work with her.  The women would buy drugs and

turn the drugs over to the Task Force. Ms. Hamlin was paid fifty dollars for every drug purchase, and Ms. Bell was paid a set fee of one hundred dollars per day.

At about 1:30 p.m. on September 23, 1999, Lieutenant Kelly and Officer Karl Jackson met Ms. Hamlin and Ms. Bell, gave the women money to buy drugs, and wired Ms. Hamlin with a wireless transmitter. Ms. Hamlin and Ms. Bell went to a house on North Home Street. The house was 414 feet from Central Elementary School's playground and 610 feet from the school building. Ms. Hamlin and Ms. Bell bought drugs at the residence, met back with the officers, and turned the drugs over to Officer Jackson. Five days later, Lieutenant Kelly and Officer Jackson put together a photograph array and showed it to Ms. Hamlin and Ms. Bell separately. Each one picked out the defendant's picture and said the defendant was the person who sold them drugs on September 23.

Officer Karl Jackson of the Union City Police Department testified as follows: He was assigned to the Twenty-Seventh Judicial District Drug Task Force and worked with Lieutenant Kelly, Kim Hamlin, and Amanda Bell on a drug purchase. After Ms. Hamlin and Ms. Bell bought drugs on September 23, they met with Officer Jackson and Lieutenant Kelly at a predetermined meeting place. Officer Jackson brought an evidence bag with him, and Ms. Bell put the cocaine that she had purchased into the bag. Officer Jackson sealed the bag, and he and Ms. Bell initialed it. The prosecution showed Officer Jackson an evidence bag containing crack cocaine, and he identified the the cocaine as the same cocaine that Ms. Bell put into the bag on September 23. On cross-examination, Officer Jackson acknowledged that he did not see the drug transaction.

Brian Eaton of the Tennessee Bureau of Investigation (TBI) Crime Laboratory testified as follows: He is a forensic scientist and analyzed the drugs contained in the evidence bag. He found that the evidence bag contained 0.7 grams of cocaine base.

Lieutenant Kelly was recalled and testified as follows: Cocaine base is commonly referred to as crack cocaine. Crack cocaine is the smokeable form of cocaine, and it is a Schedule II drug. To smoke crack cocaine, a person heats crack cocaine rocks and inhales the fumes as the crack vaporizes.

Amanda Bell testified that she had been a police officer and that she was working for the Twenty-Fourth Judicial District Drug and Violent Crimes Task Force in Carroll County, when the Twenty-Seventh Judicial District Drug Task Force asked her if she could do some undercover work. She said that on September 23, 1999, she and Kim Hamlin met with Lieutenant Kelly and Officer Jackson to discuss plans for buying drugs. She said that the officers gave her money and that she and Ms. Hamlin went to 316 North Home Street to buy drugs. She said that they pulled into the driveway of the residence and that Ms. Hamlin got out of the car and knocked on the front door. She said that Ms. Hamlin waited for a couple of minutes and that no one answered the door. She said that Ms. Hamlin got back into the car and that after they pulled out of the driveway, a car pulled up and someone inside the car asked Ms. Bell and Ms. Hamlin what they wanted. Ms. Bell said that she and Ms. Hamlin asked the people in the car where they could find someone named "D." She stated that the people in the car said that "D" was down the street. She said that as they pulled away from the house, the people in the car yelled something else but that she could not understand them. She said

that she and Ms. Hamlin drove around the block and that they went back to the house. She said that she had never seen the people in the car before.

Ms. Bell testified that when she and Ms. Hamlin got back to the house, people were sitting on the front porch. She said that Ms. Hamlin got out of the car and again asked where they could find "D." Ms. Bell said that the people on the porch asked Ms. Hamlin what she wanted and that Ms. Bell got out of the car and walked up to the porch. She said that the defendant took her and Ms. Hamlin into the house, while the other individuals stayed on the porch. She said that as they walked into the house, several people, who had been in the living room, dispersed to other parts of the house. She said that she and Ms. Hamlin went into the kitchen with the defendant and that the defendant asked Ms. Bell how much she wanted. She said that she told the defendant that she wanted a hundred dollars worth and that the defendant pulled a bag of crack cocaine out of the eye of the kitchen stove. She said that the defendant handed her six crack rocks. She said that she gave him one hundred dollars.

Ms. Bell testified that she and Ms. Hamlin went onto the porch and that she and the defendant began talking. She said that he wanted to know her name and her cellular telephone number. She said that the Drug Task Force had issued her a cellular telephone and that she gave the defendant that cellular telephone number. She said that her alias was on the voice mail for the telephone number. She said that she tried to get the defendant's name but that he never told her his name or telephone number. She said that she and the defendant spoke for a couple of minutes and that she and Ms. Hamlin left the residence. She identified the defendant as the person who sold her cocaine on September 23.

On cross-examination, Ms. Bell testified that she was in the kitchen with the defendant for about five minutes. She said that in her report, she described the seller as a black male, approximately five feet six inches tall, and weighing one hundred and fifty pounds. She said that he was wearing a gold chain with a pendant and that he had a gold tooth. She said that while she was buying drugs from the defendant, they were face-to-face. She said that she did not notice any tattoos or scars on him and that he was wearing a long-sleeved jacket. Ms. Bell stated that Lieutenant Kelly showed her six photographs and that she picked out the defendant's picture. She said that in the photograph, the defendant was not wearing a gold chain and that she did not see a gold tooth.

On redirect, Ms. Bell stated that she had not seen the defendant smile at trial and that she did not know whether he had a gold tooth. She stated that a gold tooth could be bought at a local beauty supply store for $3.99.

Kim Hamlin testified that when she was working for the Drug Task Force, she would take Ms. Bell to meet people that Ms. Hamlin knew were selling drugs. She said that she would introduce Ms. Bell to the sellers and that Ms. Bell would buy drugs from them. She said that she and Ms. Bell went to the residence at 316 North Home Street and that she had never been there before. She said that she knocked on the door, but no one answered, and she got back in the car to leave. She said that a maroon Cadillac pulled up and that she and Ms. Bell asked the people inside the Cadillac about "D." She said that they told her that "D" was down the street. She said that the

people in the car told her and Ms. Bell to go around the block. She said that she and Ms. Bell drove around the block and went back to the house. She said that when they got back to the house, the defendant and another black male were on the porch.

Ms. Hamlin testified that she, Ms. Bell, the defendant, and the black male went into the house. She said that the defendant and Ms. Bell went into the kitchen and that the black male tried to keep her in the living room. She said that she and Ms. Bell were trying to stay together and that Ms. Bell kept coming into the living room to get her. She said that she went into the kitchen with Ms. Bell and that the defendant took a bag of cocaine out of the eye of the stove. She said that he opened the baggy and asked Ms. Bell how much she wanted. Ms. Hamlin said that Ms. Bell told the defendant that she wanted "a bill," which meant that she wanted a hundred dollars worth of drugs. She said that the defendant handed Ms. Bell the cocaine and that Ms. Bell gave the defendant the money. She said that as they left, the defendant asked Ms. Bell for Ms. Bell's cellular telephone number. She said that she had never seen the defendant before September 23 and that she picked his picture out of a photograph array.

On cross-examination, Ms. Hamlin said that the drug purchase in question occurred about 1:30 p.m. She said that she did not see the defendant wearing a gold chain or a gold tooth. She said that she had not talked to Ms. Bell about the case. She said that she and Ms. Bell went to the residence because it was known as a crack house. She denied telling Lieutenant Kelly and Officer Jackson, "Charles Fields sold me some drugs" when she and Ms. Bell met with the officers after the drug purchase. She said that she did not know the defendant's name on September 23 and that the defendant had to be identified with photographs. She said that she got a good look at the defendant on September 23 and that she did not see any tattoos on his body. She said that he was wearing a jacket and a cap turned around backwards.

Allie Fields, the defendant's mother, testified as follows: At the time of trial, the defendant was twenty-eight years old and lived with his mother. He also lived with his mother in 1999. The defendant has had a scar on his eyebrow since he was a teenager. The defendant did not have any tattoos or a gold tooth.

The defendant testified that he lived in Halls, Tennessee, with his mother and that he had lived with her for about a year and a half. He said that he had three children and that he had never been married. He said that he went through the tenth grade, got his GED, and was employed. The defendant denied having a gold tooth and opened his mouth for the jury. He said that he has had a scar in his left eyebrow since he was about thirteen years old. When asked if he wore gold chains, the defendant said no. He denied selling drugs to Ms. Bell or Ms. Hamlin on September 23, 1999.

The jury convicted the defendant, and at the sentencing hearing, Dale Green of the Board of Probation and Parole testified as follows: He prepared the presentence report in this case. The defendant had five misdemeanor convictions for driving with a suspended license, two misdemeanor convictions for evading arrest, two Class C felony drug convictions, one misdemeanor conviction for assault, and one misdemeanor conviction for theft of property valued less than $500. Three of the misdemeanor offenses were committed while the defendant was serving his sentence for the

-4-

felony drug convictions. The defendant acknowledged experimenting with marijuana when he was about thirteen years old. However, the defendant denied any further illegal drug use.

Lieutenant Kelly testified as follows: There was a serious crack cocaine problem in the Union City, Obion County area. About eighty to eighty-five percent of crimes committed in that area were related to illegal drugs. In addition to the case in question, about six to eight police cases involved 316 North Home Street. However, the house was no longer a problem because "[w]e arrested everybody." Although the residence was within one thousand feet of an elementary school, Lieutenant Kelly acknowledged on cross-examination that the drug purchase that occurred on September 23, 1999, did not involve children, and no children were present in the house at the time of the crime.

Derry Lovings, the defendant's friend, testified as follows: He and the defendant grew up together. The defendant previously worked for Mr. Lovings as a stereo installer. The defendant was very dependable and would cover for Mr. Lovings when Mr. Lovings could not make it to work. Mr. Lovings was surprised when the defendant was charged with selling cocaine.

Escoe Malone, the defendant's uncle, testified as follows: The defendant was a very fine young man, and Mr. Malone was surprised when he heard that the defendant had been charged with selling cocaine. The defendant was not a big drug dealer in the community. The defendant had two young children and spent a lot of time with them.

Albert E. McCadney testified as follows: He was the pastor of the Pilgrim Rest Baptist Church. He had known the defendant all of the defendant's life, and the defendant was a member of the church. Mr. McCadney had never heard of the defendant dealing drugs, and Mr. McCadney was surprised when he found out that the defendant had been charged with these crimes. The defendant attended church regularly. Mr. McCadney had seen the defendant with one of the defendant's daughters, and the defendant seemed to love the child.

Allie Fields, the defendant's mother, testified as follows: The defendant had three children. One of the defendant's children was sexually molested by the child's stepfather and required special attention as a result of the abuse. The defendant gave the child special attention and the child needed her father. The defendant spent a lot of time with his children and took care of them. Ms. Fields was surprised when the defendant was charged with these crimes. She said that while the defendant lived with her, nothing indicated that he was dealing drugs.

The state argued that two enhancement factors applied in this case: (1) the defendant's previous criminal history and (2) evidence of his unwillingness to comply with conditions of a sentence involving release in the community. See Tenn. Code Ann. § 40-35-114(1), (8). The state argued that the defendant was not eligible for a community corrections sentence because he was a multiple offender and was convicted of a Class A felony. The defendant argued that in light of the facts of this case, he should be sentenced to community corrections.

The trial court merged the defendant's conviction for distributing cocaine into his conviction for selling cocaine. The trial court stated that, ordinarily, the defendant would have been guilty of a Class B felony. See Tenn. Code Ann. § 39-17-417(c)(1). However, because the offense occurred within one thousand feet of a school, the Drug-Free School Zone Act required that the offense be classified as a Class A felony. See Tenn. Code Ann. § 39-17-432(b). The trial court found that based on the defendant's two prior felony drug convictions, he should be sentenced as a multiple offender. The trial court noted that the sentencing range for a Range II, multiple offender was twenty-five to forty years and that because the defendant was convicted of a Class A felony, the presumptive sentence was the midpoint of that range, thirty-two and one-half years. The trial court agreed with the state that the two enhancing factors applied and increased the defendant's sentence to thirty-three years. The trial court found that no mitigating factors applied. Moreover, the trial court concluded that the Drug-Free School Zone Act prohibited sentencing the defendant to community corrections.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his conviction. Specifically, he contends that "the credibility of the State's witnesses is such that the jury's verdict in this matter can and should be set aside." The state contends that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

It is a crime for a defendant to knowingly sell a controlled substance. Tenn Code Ann. § 39-17-417(a)(3). Cocaine is a Schedule II controlled substance. Tenn. Code Ann. § 39-17-408(b)(4). If a defendant sells cocaine in the amount of one-half gram or more, the offense is a Class B felony. Tenn. Code Ann. § 39-17-417(c)(1). However, if the offense is committed within one thousand feet of an elementary school, the crime is a Class A felony. See Tenn. Code Ann. § 39-17-432(b).

Viewed in the light most favorable to the state, the evidence shows that the defendant knowingly sold cocaine in an amount greater than one-half gram to Amanda Bell within one thousand feet of an elementary school. Ms. Bell testified that she and Ms. Hamlin went to 316 North Home Street to buy drugs. Although no one was at the residence when they first arrived, Ms. Bell and Ms. Hamlin went around the block and came back to the residence. The defendant was on the porch and led the women into the kitchen. Both women testified that the defendant asked Ms. Bell how much she wanted and that Ms. Bell told the defendant that she wanted to buy one hundred dollars worth of drugs. Both women also testified that the defendant took a baggy containing crack

cocaine out of the eye of the stove and sold crack cocaine to Ms. Bell. Five days later, Ms. Bell and Ms. Hamlin separately picked the defendant's picture out of a photograph array and identified him as the seller of the cocaine. Furthermore, Lieutenant Kelly testified that the residence where the transaction took place was within one thousand feet of Central Elementary School. Although the defendant contends that Ms. Hamlin and Ms. Bell are not credible witnesses, the jury chose to believe the testimony of the state's witnesses over that of the defendant, and that is its prerogative. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). We hold that the evidence is sufficient to support the conviction.

## II. EXCESSIVE SENTENCE

Next, the defendant contends that his sentence is excessive. He argues that his sentence should be reduced and that he should be given a community corrections sentence. The state contends that the trial court properly sentenced the defendant. In addition, the state contends the defendant is ineligible for community corrections, noting that this court has held that the Drug-Free School Zone Act requires that the defendant be incarcerated for the minimum sentence.

When a defendant appeals the length, range, or manner of service of a sentence imposed by the trial court, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appealing party. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the sentence is purely de novo. Ashby, 823 S.W.2d at 169.

According to Tenn. Code Ann. § 39-17-432(b), "the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school . . ." are designated as a drug-free zone. Anyone convicted of selling cocaine within a drug-free zone "shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation." Tenn. Code Ann. § 39-17-432(b). Furthermore, "[n]otwithstanding any other provision of law or the sentence imposed by the court to the contrary, a defendant sentenced for a violation of the [Drug-Free School Zone Act] shall be required to serve at least the minimum sentence for such defendant's appropriate range of sentence." Tenn. Code Ann. § 39-17-432(c).

The state relies on this court's decision in State v. Jeffrey B. Lindemeyer, No. E1998-00665-CCA-R3-CD, Knox County (Tenn. Crim. App. Oct. 18, 1999), app. denied (Tenn. Apr. 17, 2000), in which the defendant pled guilty to selling a controlled substance within a school zone. Although the defendant met the minimum eligibility requirements for a community corrections sentence, the trial court decided that the Drug-Free School Zone Act prohibited sentencing the defendant to community corrections and that Tenn. Code Ann. § 39-17-432(c) required that the defendant be incarcerated for the minimum sentence. On appeal, the defendant argued that Tenn. Code Ann. § 39-17-432(c) did not preclude a community corrections sentence. This court disagreed, holding that

Tenn. Code Ann. § 39-17-432(c) "speaks for a mandatory incarceration." <u>Jeffrey B. Lindemeyer</u>, slip op. at 8.

We note that the defendant is not challenging the trial court's application of the law in sentencing him, and the record reveals that the trial court sentenced the defendant according to the 1989 Sentencing Reform Act. Therefore, the trial court's determinations regarding the defendant's sentence are entitled to a presumption of correctness. The trial court properly found that the defendant was not eligible for community corrections because <u>Jeffery B. Lindemeyer</u> provides that a defendant, who violates the Drug-Free School Zone Act, must be incarcerated for the minimum sentence. Although the trial court expressed concern that the defendant's sentence was unfair and "entirely too severe," it imposed the sentence in conformity with the sentencing laws. This was the defendant's third felony drug conviction and he had been convicted of two felonies and nine misdemeanors within three and one-half years. The evidence justifies the trial court's sentencing determinations and the sentence imposed.

Based on the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
JOSEPH M. TIPTON, JUDGE